UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
DEBORAH LEVINSON, THERESE JANSEN,
<u>et al.</u>, individually and on behalf of
all others similarly situated,

                Plaintiffs,

         -against-             02 Civ. 2222 (DAB)
                                  <u>MEMORANDUM & ORDER</u>

PRIMEDIA INC., ABOUT.COM, INC.,
and SCOTT KURNIT,
                Defendants,
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

     The eighty-two Plaintiffs in this suit allege that they did

not receive full payments for services they rendered to Defendant

About.com, Inc. ("About").  Their claims are brought on behalf of

themselves and a putative class of all others who are similarly

situated.[1]  They allege claims against About and its parent,

Defendant Primedia, Inc. ("Primedia"), under both the Fair Labor

Standards Act (Count I) and Articles 6 and 19 of New York Labor

Law (Count II).  They also assert a claim against these two

Defendants for breach of contract (Count III).  Plaintiffs

further assert two claims for tortious interference with

_____

     [1]No Plaintiff class has been certified.  On November 6,
2003, Judge Constance Baker Motley denied without prejudice
Plaintiffs' Motion to Circulate a Notice of Pendency and Consent
to Join.  Judge Motley's Order stated that: "Should further
discovery disclose additional facts to support Plaintiffs'
application, they may renew it upon a proper showing."  (Order,
Nov. 6, 2003.)

contractual relations, one against About's former CEO, Defendant
Scott Kurnit ("Kurnit") (Count IV), and the other against
Primedia (Count V).  Finally, Plaintiff Therese Jansen has
brought a separate Fair Labor Standards Act claim against
Defendants for allegedly discharging her in retaliation for
complaining to them about unpaid back wages (Count VI).[2]

Defendants now move for summary judgment on each count.
Defendants aver that no issue of material fact exists with
respect to Counts III, IV, V, and VI.  Defendants also argue that
summary judgment should be granted in their favor on certain
Plaintiffs' claims pursuant to Counts I and II because they fail
as a matter of law.

For the reasons contained herein, Defendants' Motion for
Summary Judgment is GRANTED IN PART and DENIED IN PART.  Summary
judgment also shall be GRANTED IN PART to Plaintiffs.  Finally,

---

[2] While Jansen did not assert in the Second Amended
Complaint a retaliatory discharge claim pursuant to Section 215
of New York Labor Law, Plaintiffs' summary judgment papers
indicate that they believe Jansen brought such a claim.  (See
Pls.' Mem. of Law at 19-20.)

The Second Amended Complaint also makes reference to
"conversion, negligence, copyright infringement under 17 U.S.C. §
501 et seq., replevin and unjust enrichment" (Second Am. Compl. ¶
1), but states no allegations which would satisfy these causes of
action.  Nor do the parties reference these claims in their
summary judgment papers.  To the extent that Plaintiffs are
bringing claims for conversion, negligence, copyright
infringement under 17 U.S.C. § 501 et seq., replevin or unjust
enrichment, those claims are hereby DISMISSED.

the claims of Plaintiffs who did not comply with discovery requirements shall be DISMISSED WITHOUT PREJUDICE, subject to the provisions stated herein.

## I. BACKGROUND

In June of 1996, William Day ("Day") and Scott Kurnit founded General Internet, which later became known as The Mining Company.  (Day Decl. ¶ 1.)   In May 1999, The Mining Company changed its name to About.com, Inc. and then to About, Inc. ("About").  (Id.)  Scott Kurnit served as General Internet/About's CEO from its inception as General Internet until September 2001 when William Day succeeded him.  Day remained in the CEO position until December 2003.  (Id.)

In February 2001, while Kurnit was its CEO, About merged with Primedia and became its subsidiary.  (Daecher Decl. ¶ 8.) On or about March 25, 2005 – three years after this case was filed – Primedia sold About, and About is no longer a subsidiary of, or otherwise affiliated with, Primedia.  (Id.)

About operates About.com, a website consisting of hundreds of topic-specific, special-interest sites.  (Day Dec. ¶ 3.)  The sites' topics are varied, and include pregnancy, mutual funds, and "Switzerland for Visitors."  (Daecher Decl. ¶ 4.)  Each topic-specific site is managed by a "Guide" who has expertise in

3

the site's topic and who is charged with posting content on it.
(Day Decl. ¶ 3.)  Plaintiffs are all former or current Guides for
About.  Defendants allege — and Plaintiffs do not contest — that
Named Plaintiffs Shane Dell, Diane Dobbs, Wendy Hogan, Peter
Lathan, Walter Logie, Murray Lundberg, Debra Macaulay, Walter
Metcalf, Gayle Olson, Roboert Olson, John Ross, Paivi Suomi,
Andrew Vadas, and Stephen Venter have never worked as Guides
within the United States.  (See Defs.' Mem. of Law at 13, n.6.)
Of the other Named Plaintiffs, only Julie Altebrando, Angela
Thor, and Jim Zwick ever worked as Guides in the State of New
York.  (See id. At 13, n.7.)


**A.   About's Agreements with the Guides**

**(1)   The 1997 Agreements**

Contracts govern the Guides' relationships with About.  The
first relevant set of contracts consists of agreements executed
in 1997 between The Mining Company and each Plaintiff.  (Defs.'
56.1 Statement ("Defs.' 56.1 Stmt."), Exhibit 5 (hereinafter
cited as "1997 Agreements").)  The 1997 Agreements provide each
Guide with a monthly stipend termed "basic compensation."  (1997
Agreements, Att. A, ¶ 1.)  The stipend varies from Guide to
Guide, but generally is between $100 and $500.  (See, e.g., id.;
see also Defs.' Mem. of Law at 4.)

4

The 1997 Agreements provide that each Guide would be eligible to share in an "advertising revenue pool." ("Revenue Pool") (1997 Agreements, Att. A, ¶ 2.) The Revenue Pool is equal to 30% of net advertising revenues, such revenues being defined as "gross ad revenues received by The Mining Company less (i) commissions to advertisers, third party sales agents, and advertising agencies, (ii) fees paid for traffic based on ad revenue, (iii) reasonable reserves for returns, make goods or other adjustments, and (iv) other sales expenses based on a share of ad revenue."[3]  (Id. ¶ 3.) Each Guide's share in the Revenue Pool would be "calculated based on the number of page views recorded on the [Guide's] site as compared with the number of page views for all sites of The Mining Company." (Id. ¶ 2.) The monthly stipends were meant to "guarantee against, and [to] be recoupable out of, any advertising revenues payable to [each Guide]." (1997 Agreements, Att. A, ¶ 1.) The parties agree that this means each Guide would receive either the monthly stipend or

---

[3] While the 1997 Agreements state that the pool is "equal to 30% of The Mining Company's advertising sales revenues" (i.e., not 30% of "net advertising revenues"), the parties do not dispute that the definition of "net advertising revenues" is meant to apply to the term "advertising sales revenues" as it appears in Paragraph 3 of Attachment A of the 1997 Agreements. (See Pls.' Mem. of Law at 3; Defs.' Reply Mem. of Law at 2.)

their share of the Revenue Pool, whichever was greater.[4]

The 1997 Agreements also fashion an "Advertising Bonus Pool" ("Bonus Pool") which is defined as "10% of the Mining Company's advertising sales revenues".[5]  (<u>Id.</u> ¶ 3.)  Each Guide was "eligible to share in" the Bonus Pool, such share to be "determined by The Mining Company in its discretion."  (<u>Id.</u>)

(2)  <u>The 1999 Agreements</u>

The second relevant set of contracts to govern the relationships between the Guides and About were executed in 1999. (<u>See</u> Defs.' 56.1 Stmt., Exh. 6 (hereinafter cited as "1999 Agreements")).  These Agreements replaced the 1997 Agreements beginning in the second quarter of 1999, and governed the Guides' duties and compensation up through the filing of this lawsuit.

---

[4] Plaintiffs state that "[t]he contracts . . . . did not provide that the plaintiffs would receive 'either' of these items, but that they would receive the greater of a specified monthly stipend or a specified share of monthly net advertising revenue." (Pls.' 56.1 Stmt. ¶ 15.)  Defendants concede this point, stating that the Guides "were compensated by either a monthly stipend . . . or a share of a percentage of About's 'net advertising revenue,' whichever was greater".  (Defs.' Mem. of Law at 4).

[5] As with the Revenue Pool, the parties do not dispute whether the "advertising sales revenues" used to calculate the Bonus Pool are the same as the "net advertising revenues" later defined in the Agreements.  (<u>See</u> Pls.' Mem. of Law at 3; Defs.' Mem. of Law at 4.)

6

(Id.; Pls.' Mem. of Law at 3.)  The latter Agreements closely
resemble the 1997 Agreements, with a few relevant distinctions.

Like the 1997 Agreements, the 1999 Agreements provide for a
monthly stipend to "be a guarantee against and recoupable out of,
any revenues payable" to each Guide.  (1999 Agreements, Att. A, ¶
1.)  The 1999 Agreements also make each Guide eligible to share
in a Revenue Pool equal to 30% of the Company's net advertising
revenues (id. ¶ 2), but define "net advertising revenues"
differently.  According to the 1999 Agreements, "net advertising
revenues" is to be calculated as "gross ad revenues actually
received by the Company, less (i) sales commissions, (ii) fees
paid for traffic, (iii) reasonable reserves for make goods or
other adjustments, and (iv) other third-party payments and
expenses for sales, advertising, and revenue."  (Id. ¶ 3.)  As
with the 1997 Agreements, each Guide's share in the Revenue Pool
is to be "calculated based on the number of page views recorded
on the [Guide's] Site during the relevant month as compared with
the number of page views for all sites of the Company."  (Id.)

The Bonus Pool provision under the 1999 Agreements also
differs from its counterpart in the 1997 Agreements.  The 1999
Agreements provide that each Guide "will be eligible to share in
a bonus pool based upon a percentage of the Company's net
advertising revenues.  The pool, if any, and [the Guide's] share

7

of the pool will be determined by the Company in its sole

discretion."  (Id. ¶ 3.)  Plaintiffs concede that Bonus Pool

compensation under the 1999 Agreements is not mandatory, and thus

Plaintiffs do not seek to recover bonus payments for any period

after the first quarter of 1999.  (Pls.' Mem. of Law at 4.)

        (3)  The Guides' Compensation Under the Agreements

        While the parties agree on the words of the Agreements, they

do not agree on the interpretation to be given them.  The parties

dispute the meaning of "advertising", "gross ad revenues", and

"net advertising revenues" as provided in either set of

Agreements and thus have calculated very different revenue

pools[6]; they do not agree on the meaning of the Agreements'

formulas for calculating each Guide's share of the Revenue Pool;

they disagree on whether discretionary bonus payments should be

credited toward payments owed to Guides; and they disagree on how

_____

        [6]Defendants have found that only in the year 2000 were
About's net advertising revenues more than zero.  (Day Decl. ¶
4.)  That year, Defendants contend, the net advertising revenues
totaled $33,565,293.13.  (Defs.' 56.1 Stmt., Att. A (citing
About.com Flash Report, Dec. 2000, at 56.1 Stmt., Ex. 16).)
Plaintiffs, however, have calculated net advertising revenues of
$3,073,788 in 1998, $57,153,774 in 2000, $18,904,845 in 2001, and
$18,869,476 in 2002.  (Pls.' 56.1 Stmt., Att. A.)  Plaintiffs
also have calculated the net advertising revenues for the first
quarter of 1999 as $2,103,801.  (See id.)  An appendix has been
included at the end of this Background section which tabulates
this and other relevant money amounts.

8

much the Guides were actually paid.[7]

According to Plaintiffs, they were not paid their correct shares of the Revenue Pool in the third and fourth quarters of 1998, in the first quarter of 1999, and in every quarter prior to the filing of this lawsuit from 2000 to 2002.[8]  (Pls.' Mem. of Law at 4.)  Plaintiffs further contend that the Guides were not paid their share of the Bonus Pool in 1998 or in the first quarter of 1999.  (Pls.' Mem. of Law at 4.)  Specifically, Plaintiffs complain that the allegedly under-compensated Guides are owed $213,682 for 1998; $298,007 for the first quarter of 1999; $6,741,534 for 2000; $887,763 for 2001; and $942,474 for the first half of 2002.[9]  (See Pls.' 56.1 Stmt, Attachment A,

---

[7] Defendants submit that the total compensation paid to About's Guides was $478,419.68 in 1997, $1,758,800.32 in 1998, $3,836,462.84 in 1999, $10,961,096.52 in 2000, $8,038,090.88 in 2001, and $3,941,198.34 in 2002.  (Defs. Swanson Dec. ¶¶ 11-15; citing Defs.' Appendices I - IV.)  Plaintiffs offer different totals for the Guides' yearly compensation: $1,730,408 in 1998, $3,784,753 in 1999, $10,740,409 in 2000, and $7,804,189 in 2001. (See Pls.' 56.1 Stmt., Attachment A, citing Pls.' 56.1 Stmt. Attachment B and Pls.' Appendices I - V.)  These numbers are included in the Appendix to this Background section ("Background Appendix").

[8] Plaintiffs concede that they were paid appropriately in 1997. (Pls.' Mem. of Law at 4.)

[9] Plaintiffs do not explain why the 1998 and 2000 numbers in the "Total by Year" column of Attachment B of their 56.1 Statement ($401,496 and $6,969,309, respectively) differ from the 1998 and 2000 numbers in the "Amount Owed to Guides" column in Attachment A of their 56.1 Statement ($213,682 and $6,741,534,

<u>citing</u> Exh. A - E therein.)  (<u>See</u> Pls.' 56.1 Stmt., Attachment B,

<u>citing</u> Exs. A & B therein).  Defendants argue that Plaintiffs'

calculations are erroneous, <u>see</u> <u>supra</u>, and that they therefore do

not owe compensation to any Guide.  Plaintiffs' and Defendants'

computations appear in the tables at the Background Appendix.


B.   <u>Therese Jansen's Alleged Retaliatory Discharge</u>

        Plaintiffs further argue that Therese Jansen, a former

Guide, complained to the Defendants that she was owed back wages.

Plaintiffs argue that her subsequent discharge was retaliatory

and that therefore she should recover damages.  Plaintiffs do not

point to any evidence which might corroborate these bare

allegations.

---

respectively).  The Court presumes, for purposes of deciding this
Motion, that the lower totals in Attachment A are the amounts
sought by the Guides.

# APPENDIX TO BACKGROUND

### PLAINTIFFS' COMPUTATIONS
(*numbers from Pls.' 56.1 Stmt., Att. A.)
(** 1997 numbers not included because not in dispute)

|  | GROSS AD REVENUES | NET AD REVENUES | AMT. ACTUALLY PAID TO GUIDES | AMT. STILL OWED TO GUIDES |
|---|---|---|---|---|
| 1998 | $3,342,288 | $3,073,788 | $1,730,408 | $213,682 |
| 1999 (1st QUARTER) | $2,122,024 | $2,103,801 | $688,097 | $298,007 |
| 2000 | $90,963,310 | $57,153,774 | $10,740,409 | $6,741,534 |
| 2001 | $28,436,919 | $18,904,845 | $7,804,189 | $889,763 |
| 2002 | $30,887,987 | $18,869,476 | N/A thru end of yr. | $942,763 (thru first half of 2002 only |

11

# APPENDIX TO BACKGROUND

## DEFENDANTS' COMPUTATIONS
### (* numbers from Defs.' 56.1 Stmt., Att. A.)
### (** 1997 numbers not included because not in dispute)

|  | GROSS AD REVENUES | NET AD REVENUES | AMT. ACTUALLY PAID TO GUIDES | AMT. STILL OWED TO GUIDES |
|---|---|---|---|---|
| 1998 | N/A | < $0 | $1,758,800.32 | $0 |
| 1999 | $12,791,980.90 | < $0 | $3,836,462.84 | $0 |
| 2000 | $87,828,928.78 | $33,565,293.13 | $10,961,096.52 | $0 |
| 2001 | $15,402,138.18 | < $0 | $8,038,090.88 | $0 |
| 2002 | $11,553,613.00 | < $0 | $3,941,198.34 | $0 |

12

## II. DISCUSSION

### A.  Legal Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  While a court must always "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.

13

1986) (<u>citing</u> <u>Anderson</u>), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." <u>Id.</u> at 12.  Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (<u>quoting</u> Fed. R. Civ. P. 56(e)).  Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Unsupported allegations in the pleadings thus cannot create a material issue of fact.  <u>Id.</u>

B.   <u>Breach of Contract</u>

"Contract remedies exist to give injured parties the benefit of their bargain." <u>Capital Nat. Bank of New York v. McDonald's Corp.</u>, 625 F. Supp. 874, 883 (S.D.N.Y. 1986) (citing <u>County of Suffolk v. Long Island Lighting Co.</u>, 728 F.2d 52, 63 (2d Cir. 1984); <u>Clalit Health Services v. Israel Humanitarian Foundation</u>, No. 02 Civ. 6552, 2003 WL 22251329, at *3 (S.D.N.Y. Sep. 30, 2003); <u>International Customs Associates, Inc. v. Ford Motor Co.</u>, 893 F. Supp. 1251, 1255-56 (S.D.N.Y. 1995).  Only parties to a contract have standing to assert a claim for breach of contract.

14

See Clalit, 2003 WL 22251329, at *3.  Without a contractual

relationship, there cannot be a contractual remedy.  Capital Nat.

Bank of New York, 625 F. Supp. at 883.

    The Agreements are governed by the law of the State of New

York.  (See 1997 Agreements ¶ 3; 1999 Agreements ¶ 13.)  To state

a claim for breach of contract in New York, a claimant must

allege:  (1) the existence of a contract; (2) that the plaintiff

has performed his or her obligations under the contract; (3) that

the defendant failed to perform his or her obligations

thereunder; and (4) resulting damages to the plaintiff.  See W.B.

David & Co., Inc. v. DWA Communications, Inc., No. 02 Civ. 8479,

2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004); Global

Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99 Civ. 342,

1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999).  "In pleading

these elements, a plaintiff must identify what provisions of the

contract were breached as a result of the acts at issue."  Wolff

v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (citing Levy v.

Bessemer Trust Co., N.A., No. 97 Civ. 1785, 1997 WL 431079, at *5

(S.D.N.Y. July 30, 1997)).

    When a summary judgment motion concerns a question of a

contract's ambiguity, "summary judgment may be granted when its

words convey a definite and precise meaning."  Seiden Assoc.'s,

Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).  On

15

the other hand, "[w]here the language used is susceptible to
differing interpretations, each of which may be said to be as
reasonable as another . . . the meaning of the words become an
issue of fact and summary judgment is inappropriate." Id.
(citations omitted).  However, New York follows the "well
established contra proferentem principle which requires that
equivocal contract provisions are generally to be construed
against the drafter." McCarthy v. Am. Int'l Group, 283 F.3d 121,
124 (2d Cir. 2002) (internal quotations and citations omitted).

    The dispute between the parties in this case pertains
chiefly to the third element, i.e., whether Defendants breached
the Agreements by not paying the Guides their allotted shares of
the Revenue Pool and Bonus Pool.  Specifically, the parties
disagree on: (1) the revenues which are advertising-related and
therefore part of gross ad revenues; (2) the appropriate method
for calculating net advertising revenues; (3) the appropriate
method for calculating each Guide's share of the Revenue Pool;
(4) whether voluntary bonus payments to certain Guides ought to
be credited against Revenue Pool shares owed to those same
Guides; and (5) the amount actually paid to the Guides.

(1)   __The Meaning of "Gross Ad Revenues"__

Neither the 1997 Agreements nor the 1999 Agreements define "advertising" or "gross ad revenues".  The parties do not agree on which revenues and expenditures are part of "gross ad revenues".  Specifically, they do not agree on whether Pay Per Click revenue, as well as overhead costs like rent, should have been included, or even were included, in the gross ad revenues.

(a)   __Pay Per Click Revenue__

According to Plaintiffs, Pay Per Click revenue is generated when an advertiser places an Internet link on an Internet website and agrees to pay a fee to the host website when an Internet visitor "clicks" on the link.  (Pls.' 56.1 Statement ¶ 52.) Defendants do not dispute this definition, but assert that the Pay Per Click revenue was "derived from a product separate from and unrelated to the Guide sites on About.com", and therefore was not meant to be included in "the designated sources that constituted gross or net advertising revenue under the Guide contracts."  (Day Reply Decl. ¶ 4.)

While Defendants supply a Declaration from one of the co-founders of About's predecessor, General Internet, to corroborate their argument, they do not cite to any other document to support their view that Pay Per Click revenue is related to a product

17

that is separate and apart from the Guides' Sites.  In light of
the fact that Pay Per Click revenue accrues when people click on
"advertisers' links", and in light of the fact that the
Agreements do not make reference to whether "gross ad revenues"
relate only to revenues earned through the Guides' sites,[10]
Defendants' argument that Pay Per Click revenue is not related to
advertising and therefore not meant to be included in gross ad
revenues is not supported by the record before the Court.


          (b)   Overhead Costs

     The parties also disagree on whether certain overhead costs,
such as rent which Defendants claim was paid by their Sales and
Marketing Departments, are advertising-related.  (See Pls.' Mem.
of Law at 12; Defs.' Reply Mem. of Law at 6.)  Plaintiffs contest
that overhead costs are administrative, and not related to
advertising.  These overhead costs, Plaintiffs state, should
never have been, and were never, part of gross ad revenues in the
first instance, and therefore should not have been deducted when
calculating net advertising revenues.  (Pls.' Mem. of Law at 12.)

---

     [10] The 1997 Agreements state that revenue amounts shall "be
based on net advertising revenues . . . from applicable
advertising sources" (1997 Agreements, Att. A, ¶ 3), and the 1999
Agreements state that revenue amounts shall "be based on net
advertising revenues . . . from advertising sources designated by
the Company" (1999 Agreements, Att. A, ¶ 3).

Defendants provide no documentation to dispute this.  Nor have Defendants shown that About did allocate these costs as gross ad revenues.  Indeed, Defendant Kurnit stated that it would be "illogical" to deem "overhead costs" as part of gross ad revenues.  (Kurnit Dep. 64-65, at Exh. Q in Pls,' 56.1 Stmt.)

To be sure, the excerpt furnished from Kurnit's deposition does not make clear which overhead costs he believes are unrelated to advertising (i.e., rent or something else).  In any event, Defendants do not argue what other kinds of overhead costs might reasonably be advertising-related.  Nor do Defendants provide evidence about which part of the rent or other overhead costs they purportedly allocated as advertising expenses. Defendants present no evidence whether overhead expenses actually are related sufficiently to advertising so as to fall within the scope of gross ad revenues, or whether Defendants actually allocated such overhead costs as gross ad revenues.

Accordingly, Defendants' Motion for Summary Judgment is hereby DENIED as to the meaning of "advertising" and "gross ad revenues".

### (2)  Calculating Net Advertising Revenues

The parties also do not agree on how to calculate net advertising revenues.  Specifically, they do not agree on what is

meant in the 1997 Agreements by "(i) commissions to advertisers, third party sales agents, and advertising agencies, (ii) fees paid for traffic based on ad revenue, (iii) reasonable reserves for returns, make goods or other adjustments, and (iv) other sales expenses based on a share of ad revenue".  (1997 Agreements ¶ 3.)  Nor do they agree on what is meant in the 1999 Agreements by "gross ad revenues actually received by the Company, less (i) sales commissions, (ii) fees paid for traffic, (iii) reasonable reserves for make goods or other adjustments, and (iv) other third-party payments and expenses for sales, advertising, and revenue".  The parties agree that these terms determine what should be deducted from gross ad revenues to arrive at net advertising revenues, but they do not agree on which expenditures these terms describe.

       (a)  <u>1997 Agreements</u>

     Plaintiffs contend that neither "distribution costs" nor expenditures related to "on-line media and off-line branding" are within any of the categories of deductible expenditures in the 1997 Agreements.  (Pls.' Mem. of Law at 10.)  Defendants disagree.  (<u>See</u> Defs.' 56.1 Statement, Att. A, n.4.)

     None of the parties explain what "distribution costs", "on-line media", or "off-line branding" are.  Without more, a jury

reasonably could find, for instance, that "distribution costs" are "fees paid for traffic based on ad revenue"; or a jury could find that they are not.  A jury could reasonably find that "on-line media" expenses are "other sales expenses based on a share of ad revenue"; or a jury could find that they are not.  The Court has no basis to conclude as a matter of law that "distribution costs" and expenditures related to "on-line media and off-line branding" were to be deducted from gross ad revenues when calculating net advertising revenues under the 1997 Agreements.

> (b)  <u>1999 Agreements</u>

As to the 1999 Agreements, Plaintiffs contend that the clause requiring the deduction of "other third-party payments and expenses for sales, advertising, and revenue" refers only to payments and expenses related to third-party transactions. (Pls.' Mem. of Law at 10.)  Defendants counter that the descriptor "third-party" refers only to "payments" but does not refer to "expenses for sales, advertising, and revenue."  (Defs.' Reply Memo. of Law at 5-6.)  Defendants argue that according to this reading, wages paid to employees in their Sales and Marketing Departments, for example, are among the expenditures to be deducted from gross ad revenues when calculating net

advertising revenues.  (Id.)

   Both Plaintiffs' and Defendants' readings of this provision
are reasonable.  No party presents any objective or expert
evidence supporting his position.  Whether the wages of About's
sales and marketing employees should be included within the scope
of this clause hinges on which meaning of the clause a jury deems
to have been the intent of the parties.  The proper meaning to be
given to this clause cannot be decided as a matter of law on the
facts before the Court.

   The parties also dispute whether this clause envisions the
deduction of certain "costs of sales".  (Pls.' Mem. of Law at 12-
13; Defs.' Reply Mem. of Law at 8-9.)  According to Defendants,
these "costs of sales" include, among other things, "costs . . .
for an internet service set up to drive traffic to About.com."
(Defs.' Reply Mem. of Law at 8 n.5.)  But Defendants do not limit
the "costs of sales" to these types of expenses, nor do they
explain what other costs may be "costs of sales".  Instead, they
attack the testimony of Plaintiffs' expert on "costs of sales" as
inadmissible.  (Id. at 8-9.)  Whether or not Plaintiffs' expert
testimony is admissible is of no import here, because the Court
finds that a reasonable juror could conclude, even absent the
expert's testimony, that such "costs of sales" as "costs for an
internet service set up to drive traffic to About.com" may or may

not have been intended to be deducted from gross ad revenues when calculating net advertising revenues.  For example, a jury could reasonably conclude that such costs are "fees paid for traffic", which is the second of the four types of expenditures to be deducted under the 1999 Agreements.  Accordingly, Defendants' Motion for Summary Judgment on the issue of which expenses should be deducted from gross ad revenues to calculate net advertising revenues is hereby DENIED.[11]

### (3)  Calculating Each Guide's Share of the Revenue Pool

While the 1997 and 1999 Agreements are clear that the Revenue Pool is equal to 30% of the net advertising revenues (1997 Agreements ¶ 3; 1999 Agreements ¶ 3),  the parties do not concur on what percentage of the Revenue Pool should be

---

[11] Plaintiffs also argue that the amounts that Defendants proffer for net advertising revenue do not correspond to revenues About reported to the SEC.  (See Defs.' 56.1 Stmt., Exhs. 7 & 8.) Because About noted in its SEC filings that "substantially all" of the reported revenue was advertising revenue (Pls.' 56.1 Stmt., Exhs. N, O, & P), Plaintiffs contend that those numbers should correspond approximately to the numbers supplied by Defendants in their Motion papers.  (Pls.' Mem. of Law at 7).

Not only is "substantially all" an imprecise arithmetic phrase, but more importantly, Defendants assert that the revenue reported on About's SEC filings pertains to all of About's businesses, not just the About.com website.  (Defs.' Reply Mem. of Law at 4-5.)  For these reasons, the SEC filings do not transform the accuracy of Defendants' calculations into an issue that can be decided as a matter of law.

apportioned to each Guide.

The Agreements state that the Guides' portions of the Revenue Pool are to be "calculated based on the number of page views recorded on the [Guide's] site as compared with the number of page views for all sites of [About]."  (1997 Agreements ¶ 3; 1999 Agreements ¶ 3.)  Plaintiffs argue that this clause prescribes a directly proportional analysis of Guide page views to total page views.

Defendants contend that the Agreements do not intend for each visit to a Guide's site to be counted the same as visits to other Guides' sites.  (Defs.' Reply Mem. of Law at 7.)  A "page view", Defendants argue, is not equal to the number of times a page is viewed.  (Id.)  To corroborate their view, Defendants submit the deposition of Audrey Russell, who was responsible for the Guides' compensation.  She states that: "pages became worth different amounts . . . .  The pages would contain advertising, and based on whether they had advertising or not, they would be worth different amounts of money in payment."  (Russell Dep., Swanson Supp. Decl., Exh. 25 at 28:22-24.)  Defendants argue that where the Agreements refer to "page views", they refer not just to "number" of page views, but also to the "mix" of page views. (Defs.' Reply Mem. of Law at 7.)

There is no mention of "mix of page views" or "value of page

views" in the Agreements.  The formula prescribed is clear on its face and shall not be muddied by Defendants' tautologies.  Each Guide's portion of the Revenue Pool should be equal to the percentage of views of all of About.com's sites that were page views of that particular Guide's site or sites.  The Court hereby GRANTS summary judgment to Plaintiffs on this issue.[12]

---

[12] It has long been the law of this Circuit that "as long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." First Financial Ins. Co. v. AllState Interior Demolition Corp., 193 F.3d 109, 115 (2d Cir. 1999); see also Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991) (noting that a district court's sua sponte granting of summary judgment in favor of a non-moving party is "an accepted method of expediting litigation," as long as "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice"); Lowenschuss v. Kane, 520 F.2d 255, 261 (2d Cir. 1975) ("We have sanctioned a sua sponte award by the court of summary judgment to a non-moving party where it appeared from the papers, affidavits and other proofs submitted by the parties that there were no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law.").

Defendants, who moved for summary judgment on the breach of contract, among other theories, have had a full and fair opportunity to establish their case and have provided no "indication that [they] might otherwise bring forward evidence that would affect the court's summary judgment determination." Coach Leatherware, 933 F.2d at 167.  As the Court has before it all the facts necessary to find for Plaintiffs, the Court may grant summary judgment in their favor on this issue sua sponte.

### (4)   Crediting Voluntary Bonus Payments

Plaintiffs concede that voluntary bonus payments were made to some Guides.  (Pls.' Mem. of Law at 9.)  These voluntary bonus payments were not Bonus Pool payments per se, but were made at About's discretion.

Plaintiffs argue that these voluntary payments, which often were tendered during one part of a year, do not absolve About's obligation to pay each Guide every month either their stipend or their Revenue Pool share, whichever is greater.  (Id.) Defendants argue that their voluntary bonus payments, whenever during the year they were paid, should be credited toward the Guides' Revenue Pool shares.  Defendants characterize Plaintiffs' frustration here as a grievance about the timing – not the amount – of their compensation.  (Defs.' Reply Mem. of Law at 6 n.3.)

Plaintiffs are correct that the Agreements require compensation on a monthly basis.  (See 1997 Agreements, Att. A ¶ 1; 1999 Agreements, Att. A ¶ 1.)  That Defendants chose arbitrarily at times (i.e., in their discretion) to pay voluntary bonus payments to some Guides does not vitiate Defendants' obligation to pay Guides according to the terms of the Agreements.  Further, at the time of payment there is no evidence before the Court that Defendants made clear which – if either – contractual obligation was being met by the voluntary bonus

26

payment.  Thus there is no basis upon which to calculate a set-off against contractual obligations.

Accordingly, summary judgment is hereby DENIED to Defendants on the issue of whether discretionary bonus compensation paid to a Guide should be credited against compensation otherwise owed to that Guide.


(5)  <u>Amount Actually Paid to Guides</u>

_____Defendants submit "business records"[13] which indicate that the total compensation paid to About's Guides pursuant to the 1997 and 1999 Agreements is $478,419.68 in 1997, $1,758,800.32 (1998) $3,836,462.84 (1999), $10,961,096.52 (2000), $8,038,090.88 (2001), and $3,941,198.34 (2002).  (Defs. Swanson Dec. ¶¶ 11-15; <u>citing</u> Defs.' Appendices I - IV.)  Plaintiffs argue that Defendants' totals are incorrect because they include Revenue Pool shares that were apportioned for sites to which no Guides were ever assigned, and therefore Revenue Pool shares which were never actually paid to any Guide.  (Pls.' Mem. of Law at 17.) Plaintiffs submit their own spreadsheets which are compiled "from the information that has been introduced into the record of these

_____

[13] Defendants do not provide further identifying information for these "business records".  They appear to be documents generated internally by Defendants in the normal course of business.

proceedings." (Greenberg Dec. ¶ 3, <u>citing</u> Pls.' Appendices I - V.)  Plaintiffs' spreadsheets offer different totals for the Guides' yearly compensation: $1,730,408 (1998), $3,784,753 (1999), $10,740,409 (2000), and $7,804,189 (2001).[14]  (<u>See</u> Pls.' 56.1 Stmt., Attachment A, <u>citing</u> Pls.' 56.1 Stmt. Attachment B <u>and</u> Pls.' Appendices I - V.)

Whose spreadsheets to credit is a genuine issue of material fact for a jury.  Accordingly, Defendants' Motion for Summary Judgment is DENIED as it pertains to the amount that the Guides actually were compensated.


(6)  <u>May Primedia Be Held Liable?</u>

Defendants contend that in the event that any breaches of the Agreements are found to have occurred, About's parent company, Primedia, cannot be liable for them.  Plaintiffs counter that About and Primedia are alter egos, and that therefore Primedia is subject to the same liability as About.

Two elements must be pleaded to assert alter ego liability in New York: (1) the entity must exercise such dominion and control with respect to the transaction attacked that the subsidiary had no separate will of its own, and (2) the

---

[14] As stated <u>supra</u>, Plaintiffs have not calculated the total compensation actually paid to the Guides in 1997 or in 2002.

domination and control must be used to commit a fraud or wrong against the [Plaintiffs].  American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988).[15]

Plaintiffs rest entirely on their allegations from the Second Amended Complaint to corroborate their view that Primedia and About are alter egos.  The only sentence in their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment which addresses this issue states: "The complaint makes extensive allegations that Primedia is a jointly liable partner (or alter ego) of About.com and the Count III [sic] seeks relief jointly against About.com and Primedia."  (Pls.' Mem. of Law at 17 (internal citations omitted).)

Bare allegations in a party's initial pleadings cannot defeat a summary judgment motion.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (establishing facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up'") (internal citations omitted).  Indeed, all the evidence on the record indicates that About was the conductor of its own business, not Primedia.

---

[15] Although the law of the state of incorporation typically governs alter ego claims, "where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."  American Fuel Corp. v. Utah Energy Development, 122 F.3d 130, 134 (2d Cir. 1997).

Plaintiffs' statement elsewhere in their brief that About made none of its own SEC filings after 1999 (Pls.' Mem. of Law at 19) is not enough to suggest reasonably that Primedia exercised dominion and control over About's conduct under the Agreements.

Accordingly, Defendants' Motion is hereby GRANTED that Primedia has no liability for breach of contract.[16]

C.   <u>Tortious Interference with Contract</u>

Defendants also have moved for summary judgment on Plaintiffs' claims against Kurnit and Primedia for tortious interference with contractual relations.  According to Plaintiffs, these two parties induced About to breach the 1997 and 1999 Agreements for their own financial enrichment.

Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff. <u>Finley v. Giacobbe</u>, 79 F.3d 1285, 1294 (2d Cir. 1996) (<u>citing</u> <u>Israel v. Wood Dolson Co.</u>, 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99–

---

[16] For these reasons, Defendants' Motion is also GRANTED as to Primedia's liability under the FLSA and under Articles 6 and 19 of New York Labor Law.

100 (1956); <u>Kaminski v. United Parcel Serv.</u>, 501 N.Y.S.2d 871,
873 (N.Y. App. Div. 1986)).


    (1)  <u>Tortious Interference Claim Against Kurnit</u>

    The Court has concluded that the 1997 and 1999 Agreements
are contracts (first element).  <u>See</u> <u>supra</u>.  It cannot be disputed
that Kurnit, as About's CEO, had knowledge of those Agreements
(second element).  Plaintiffs do not direct the Court, however,
to any document or deposition which memorializes Kurnit's
purported intent to manipulate About's financial arrangements
with Plaintiffs (third element).  Rather, as with their breach of
contract claims against Primedia, Plaintiffs rely solely on their
pleadings to defeat Kurnit's argument.

    Even were allegations in a pleading sufficient to raise
material fact issues, the Second Amended Complaint does not
allege that Kurnit was a stranger to the contract.  (Second Am.
Compl. ¶¶ 58-61.)  <u>See</u> <u>Finley</u>, 79 F.3d 1285, 1295 (<u>citing</u> <u>Wood
Dolson Co.</u>, 1 N.Y.2d at 120; <u>Winicki v. City of Olean</u>, 611
N.Y.S.2d 379, 380 (N.Y. App. Div. 1994) (only "a stranger to a
contract" may be liable for tortious interference)); <u>Artwear,
Inc. v. Hughes</u>, 615 N.Y.S.2d 689, 694 (N.Y. App. Div. 1994)).  A
defendant-employee is a "third party," only where "the defendant-
employee has exceeded the bounds of his or her authority."

31

<u>Finley</u>, 79 F.3d at 1295 (<u>citing</u> <u>Kosson v. Algaze</u>, 610 N.Y.S.2d 227, 228-29 (N.Y. App. Div. 1994) (employer's agents may not be held liable for tortious interference "absent a showing that they acted outside the scope of their authority"), aff'd, 84 N.Y.2d 1019, 646 N.E.2d 1101 (1995)); <u>see also</u> <u>Solow v. Stone</u>, 994 F. Supp. 173, 181 (S.D.N.Y. 1998) (agent may not be held liable for tortious interference so long as he is working in scope of his authority).  Moreover, a "'corporate officer who is charged with inducing the breach of a contract between the corporation and [the other contracting parties] is immune from liability if it appears that he is acting in good faith as an officer [and did not commit] independent torts or predatory acts directed at another."'  <u>Murtha v. Yonkers Child Care Ass'n, Inc.</u>, 45 N.Y.2d 913, 915 (1978) (<u>quoting</u> <u>Buckley v. 112 Cent. Park South</u>, 285 A.D. 331, 334 (N.Y. App. Div. 1954)); <u>see also</u> <u>Cohen v. Davis</u>, 926 F. Supp. 399, 404 (S.D.N.Y.1996) (applying <u>Murtha</u> rule to supervisory employee); <u>BIB Constr. Co. Inc. v. City of Poughkeepsie</u>, 612 N.Y.2d 283, 285 (N.Y. App. Div. 1994) (employer's agent may be liable for tortious interference if the "agent does not act in good faith and commits independent torts or predatory acts directed at another for personal pecuniary gain").

Plaintiffs allege in their Second Amended Complaint that

Kurnit instituted deceptive payment schedules to benefit him when he sold his About stock to Primedia.  (Second Am. Compl. ¶¶ 58-60.)  Not only do mere allegations not suffice to avoid summary judgment, but Plaintiffs also do not explain how these acts were "predatory" or "independent" of About's alleged alteration of Guides' payment schedules.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' claim against Kurnit for tortious interference is hereby GRANTED.


(2)  <u>Tortious Interference Claim Against Primedia</u>

Plaintiffs also have lodged a tortious interference claim against Primedia, and Defendants have moved to dismiss it. Generally in New York, parent corporations may not tortiously interfere with their subsidiaries' contracts.  <u>Multi-Juice, S.A. v. Snapple Beverage Corp.</u>, 2003 WL 1961636, at *5 (S.D.N.Y. 2003).  <u>See also</u> <u>Koret, Inc. V. Christian Dior, S.A.</u>, 554 N.Y.S.2d 867 (1st Dept. 1990).  An exception to this rule exists when the parent has acted with malice.  <u>MTI/The Image Group, Inc. v. Fox Studios, East, Inc.</u>, 554 N.Y.S.2d 20, 23-24 (1st Dept. 1999).

There is no basis for excepting Primedia from the general rule.  Plaintiffs cite only their Second Amended Complaint, which

does not make clear whether Primedia's alleged interference preceded or followed its acquisition of About as a subsidiary. (See Second Am. Compl. ¶¶ 64-77.)  Plaintiffs also reference no evidence which reasonably could prove Primedia's intent to procure financial gain to the detriment of, or even independent of, About.  Plaintiffs' only argument is that Primedia "can be charged with knowledge of About.com's accounting practices. Whether those accounting practices were 'improper' (i.e., deceptive) because About.com concealed its failure to pay Guides according to their contracts while simultaneously claiming it was making full and proper payments to the Guides, is an issue of fact for trial."  (Pls.' Mem. of Law at 19.)  But knowledge of an alleged improper accounting practice does not amount to tortious interference with a contract, even if such accounting practice impacts the parties' conduct under the allegedly breached contract.  Plaintiffs do not argue, as they must, that Primedia intentionally and affirmatively provided an impetus for the breach.  See Cantor Fitzgerald Associates, L.P. v. Tradition North America, Inc., 749 N.Y.S.2d 249, 249-50 (1st Dept. 2002) (requiring that the alleged interferor's action was the sine qua non of the alleged contract breach).

As with their breach of contract claim against Primedia, Plaintiffs merely allege their tortious interference claim

34

against Primedia.  Even were a juror to find those allegations
true (and they would have no evidentiary basis for doing so),
those allegations do not make out a claim against Primedia for
tortious interference.  Accordingly, Defendants' Motion as to
Plaintiffs' claim against Primedia for tortious interference is
GRANTED.


D.    <u>FLSA and New York Labor Law Claims</u>

      (1)   <u>Independent Contractor/Employee Issue</u>

      In their letter of August 29, 2005, Defendants argued that
because "[t]he determination regarding the status of an
individual as an employee of independent contractor is a question
of law", a motion for summary judgment on Plaintiffs' FLSA and
New York Labor Law claims should be granted in their favor.  On
September 15, 2005, this Court ruled that "Plaintiffs' motion for
class certification shall be held in abeyance until the
'employee/independent contractor' issue is resolved through
Defendants' summary judgment motion" (Order, Sept. 15, 2005, at
2), thereby directing Defendants to address the
employee/independent contractor issue in their Motion.  Except
for brief mentions in their 56.1 Statements which simply restate
the parties' dispute about this issue (Defs.' 56.1 Stmt. ¶ 15;
Pls.' 56.1 Stmt. ¶ 15), the parties do not address the

employee/independent contractor question in their papers.
Therefore, this issue remains a question of fact to be determined
at trial.

    (2)  <u>FLSA Claims</u>

     Defendants have moved to dismiss the FLSA claims of
Plaintiffs who did not provide services to About in the United
States.  (Defs.' Mem. of Law at 13.)  According to the Fair Labor
Standards Act, the wage provisions do not apply "with respect to
any employee whose services during the workweek are performed
within a foreign country."  29 U.S.C. § 213(f).  Plaintiffs have
not disputed this point.

     As stated <u>supra</u>, Plaintiffs Shane Dell, Diane Dobbs, Wendy
Hogan, Peter Lathan, Walter Logie, Murray Lundberg, Debra
Macaulay, Walter Metcalf, Gayle Olson, Robert Olson, John Ross,
Paivi Suomi, Andrew Vardas, and Stephen Venter resided outside of
the United States during the time that they were Guides.
Accordingly, Defendants' request to dismiss those Plaintiffs'
FLSA claims is hereby GRANTED.

    (3)  <u>New York Labor Law Claims</u>

     Defendants also argue that Plaintiffs who worked outside New
York are outside the purview of Articles 6 and 19 of New York

36

Labor Law.  While Plaintiffs do not respond to Defendants'
argument, the 1997 and 1999 Agreements provide that they "will be
governed by the laws of the State of New York."  (1997 Agreements
¶ 3; 1999 Agreements ¶ 13.)  An agreement to apply New York law
to a contract is tantamount to an agreement to apply New York
statutory law to disputes about commissions owed under said
contract.  See, e.g., Winter-Wolff International, Inc. v. Alcan
Packaging Food & Tobacco, Inc., 2007 WL 1655777, at *8 (E.D.N.Y.,
Jun. 5, 2007), cf. Frishberg v. Espirit De Corp., 778 F. Supp.
793 (S.D.N.Y. 1991).  Because the parties chose to apply New York
law, it is not relevant that the New York legislature stated that
the New York Labor Law is meant to protect persons employed "in
New York State".  N.Y. Lab. Law § 650.

     Accordingly, Defendants' Motion for Summary Judgment on all
non-New York Plaintiffs' New York Labor Law claims is DENIED.


E.    Therese Jansen's Retaliatory Discharge Claim

     Therese Jansen alleges in the Second Amended Complaint a
retaliatory discharge claim against Defendants pursuant to the
FLSA, but not pursuant to New York Labor Law.  Defendants have
moved for summary judgment on Jansen's FLSA retaliation action,
arguing that Jansen never lodged a formal complaint against her
employer on which Defendants could retaliate.  Plaintiffs'

37

opposition memorandum does not respond to this argument, but rather asserts that Jansen's purported retaliation claim pursuant to New York Labor Law should survive.  (See Pls.' Mem. of Law at 19-20.)  Because the Second Amended Complaint states no New York Labor Law claim on which this Court can rule, Jansen's argument is moot.

But even had Jansen brought a retaliation claim pursuant to New York Labor Law, it would not have survived.  She is a resident of the State of California.  (Jansen Dep. 22:2-25, at Swanson Suppl. Decl., Exh. 24.)  See N.Y. Lab. Law § 650, cited supra (providing that New York Labor Law is intended to protect the people of New York).

Moreover, had Jansen responded to Defendants' argument that she is not protected by the FLSA, she could not have done so successfully.  Defendants submit an excerpt of Jansen's deposition testimony, where she states: "I believe the reason why I was terminated as a guide by About had nothing to do with my site, but rather had to do with my involvement in discussion on the guide forum."  (Jansen Dep. 220:7-10, at Swanson Dec., Exh. 3.)  Jansen provides no evidence to dispute this testimony or to explain how this testimony may relate to any formal complaint lodged against her employer, and therefore she cannot defeat a summary judgment motion on this issue.

Accordingly, Defendants' Motion for Summary Judgment as to Jansen's retaliatory discharge claim is hereby GRANTED.

F.    Dismissal of Noncompliant Plaintiffs

Concomitant with the filing of their Motion Papers, Defendants wrote to the Court requesting that twenty-six named Plaintiffs who did not comply during discovery be dismissed from the suit.  (See Defs.' Letter, dated Jan. 25, 2005 (hereinafter cited as "Defs.' Letter").[17])  Plaintiffs do not dispute that the following Plaintiffs never responded to Defendants' discovery requests: Suzanne J. Barrett, Krista Marie Beck, Edward Bott, Robert H. Brown, Janet W. Burns, Mark E. Hessey, Wendy Hogan, Lori Holuta, Peter D. Lathan, Murray Wayne Lundberg, Patricia Michaels, Tracy Lee Morris, Melany S. Nottenius, Robert Rak, Kelly Rivera, John Gordon Ross, Eponine Sallee, Rachel Sanfordlyn Shreckengast, Kathy Stolley, David J. Sweet, Steven Graham Venter, Carol Vest, Ann Zeise, and Jim Zwick ("Noncompliant Plaintiffs").  (Defs.' Letter, Exh. B; Pls.' Letter, dated Feb. 27, 2006 (hereinafter cited as "Pls. Letter"), at 1.)  Plaintiffs also do not dispute that two additional Plaintiffs — Marshall Bowden and Angela Thor (also included within "Noncompliant

_____

[17] While Defendants' letter is dated January 25, 2005, it appears to have been drafted on January 25, 2006.  The Court received the letter on January 26, 2006.

Plaintiffs") – refused to appear for depositions.[18]  (Defs.'
Letter at 1-2; Pls.' Letter at 1.)  Despite these concessions,
Plaintiffs' Counsel argues that the Noncompliant Plaintiffs
should be dismissed without prejudice – rather than with
prejudice – so that they may recover as unnamed members of a
putative class.

Rule 41(b) of the Federal Rules of Civil Procedure provides
that:

> For failure of the plaintiff to prosecute or to
> comply with [the Federal Rules of Civil Procedure]
> or any order of court, a defendant may move for
> dismissal of an action or of any claim against the
> defendant.   Unless the court in its order for
> dismissal otherwise specifies, a dismissal under
> this subdivision . . . operates as an adjudication
> upon the merits.

Fed. R. Civ. P. 41(b).  The Second Circuit has held that district
courts have authority to dismiss a case sua sponte for a
plaintiff's failure to prosecute or comply with court orders.
LeSane v. Hall's Sec. Analyst. Inc., 239 F.3d 206, 209 (2d Cir.
2001).

"At the same time, a Rule 41(b) dismissal remains 'a harsh
remedy to be utilized only in extreme situations.'" LeSane, 239

---

[18] Plaintiffs' Counsel already has indicated to Defendants
that Bowden and Thor intend to withdraw from the lawsuit.  (See
Defs.' Letter, Ex. C.)  The Court, however, has received no
communications from Bowden, Thor, or their Counsel pertaining to
their withdrawal.

F.3d at 209, quoting Thielmann v. Rutland Hosp., Inc., 455 F.2d
853, 855 (2d Cir. 1972).  A court contemplating a Rule 41(b)
dismissal must consider the following factors: (1) the duration
of Plaintiffs' failures; (2) whether Plaintiffs have received
notice that further delays would result in dismissal; (3) whether
Defendants are likely to be prejudiced by further delay; (4)
whether the district judge has taken care to strike the balance
between alleviating court calendar congestion and protecting a
party's right to due process . . . and (5) whether the judge has
assessed adequately the efficacy of lesser sanctions.  LeSane,
239 F.3d at 209, citing Alvarez v. Simmons Market Research
Bureau, Inc., 839 F.2d 930, 932 (2d Cir. 1988).

      The time between Noncompliant Plaintiffs' failures to
respond to discovery requests and Defendants' Motion for Summary
Judgment was substantial: almost three years (first factor).
(Defs.' Letter at 2.)  Plaintiffs also were notified sufficiently
by Magistrate Judge Gorenstein of the possibility of dismissal at
a hearing on February 6, 2004 (second factor).[19]  Dismissal of

_____

      [19] At a hearing on February 6, 2004, Magistrate Judge Gabriel
W. Gorenstein admonished Plaintiffs:

      If the [discovery] deadline is not met, I'm going
      to state it now that unless there's good cause
      shown that's not perceivable today they'll be
      precluded.  They'll be dropped as plaintiffs.  So
      plaintiffs should consider themselves warned.  I

Noncompliant Plaintiffs' suit is warranted.

The other factors, however, counsel against dismissing their claims with prejudice.  While Defendants may have been disadvantaged by Noncompliant Plaintiffs' past failures, Defendants likely would not suffer from Noncompliant Plaintiffs' future recovery as unnamed putative class members (third factor). Permitting Noncompliant Plaintiffs to join other unnamed putative class members – if and only if a putative class is certified – would not beset Defendants unnecessarily, because Defendants already would be addressing other putative class members' claims. Dismissing Noncompliant Plaintiffs' claims without prejudice to their ability to recover as unnamed putative class members also comports with one of the policies which motivates collective suits:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

---

> understand there's a lot of them, but when a lot of people sue then a lot of them have got to do a lot of work . . . . If 82 people sue and if they don't have 82 lawyers then maybe it means 82 times as much work for that one lawyer, but that's what it is.

(Tr., Feb. 6, 2004, 36:12-20, <u>cited at</u> Defs.' Letter, Exh. A.)

Amchem Products, Inc. V. Windsor, 521 U.S. 591, 617 (1997)
(internal quotations omitted).  Collective actions were designed
to permit parties like Noncompliant Plaintiffs who cannot, or
choose not to, navigate the cumbersome litigation process to
recover nonetheless.

        In light of the fact that dismissal with prejudice is the
harshest of sanctions (fifth factor), and in light of the fact
that Magistrate Judge Gorenstein's admonition reasonably could be
interpreted as a warning that Noncompliant Plaintiffs would be
excluded from suit only as Named Plaintiffs, Noncompliant
Plaintiffs' claims against Defendants shall be DISMISSED WITHOUT
PREJUDICE to their ability to recover as unnamed putative class
members.  This dismissal shall not be deemed a ruling by the
Court that any putative class will be certified.  In the event
that a putative class is not certified, the fourth LeSane factor
– considerations of Noncompliant Plaintiffs' disregard for the
Court's calendar congestion – demands that Noncompliant
Plaintiffs shall not be permitted to file the exact same suit at
a later date.  They may only recover as unnamed putative class
members, if such putative class is certified.

### III. CONCLUSION

For the reasons contained herein, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

(1) Defendants' request for summary judgment on the meaning of "advertising" and "gross ad revenues" is hereby DENIED;

(2) Defendants' request for summary judgment on the issue of which expenses to deduct from gross ad revenues when calculating net advertising revenues is DENIED;

(3) Defendants' request for summary judgment on the issue of whether to credit each Guide's potential recovery with the voluntary bonuses paid to that Guide is DENIED;

(4) Defendants' request for summary judgment on the amount actually paid to Guides is DENIED;

(5) Defendants' request for summary judgment on the issue of whether Primedia may be held liable for any asserted claims, including tortious interference with contract, breach of contract, the claim pursuant to FLSA, and the claim pursuant to Articles 6 and 19 of New York Labor Law, is GRANTED;

(6) Defendants' request for summary judgment on the issue

        of whether Scott Kurnit may be held liable for tortious interference with contract is GRANTED;

(7)  Defendants' request for summary judgment against FLSA Plaintiffs who worked outside the United States during the times relevant to this suit is GRANTED;

(8)  Defendants' request for summary judgment against New York Labor Law Plaintiffs who worked outside the State of New York during the times relevant to this suit is DENIED; and

(9)  Defendants' request for summary judgment against Plaintiff Therese Jansen on her FLSA retaliatory discharge claim, and on her purported New York Labor Law retaliatory discharge claim, is GRANTED.

Furthermore, summary judgment is GRANTED in favor of Plaintiffs on the issue of how to calculate each Guide's share of the Revenue Pool.

To the extent that Plaintiffs have brought claims for conversion, negligence, copyright infringement under 17 U.S.C. § 501 et seq., replevin or unjust enrichment, those claims are hereby DISMISSED.

This Court also DISMISSES WITHOUT PREJUDICE the Noncompliant Plaintiffs' remaining claims against About. Noncompliant Plaintiffs may not recover in a newly stated action, but may

recover as unnamed members of a putative class, if such putative class is certified.

Should Plaintiffs choose to renew their Motion to Circulate a Notice of Pendency and Consent to Join, or should they choose to file a Motion for Class Certification, they shall do so within 45 (forty-five) days of the date of this Order.  Defendants shall respond to such motion within 45 (forty-five) days of its being served on them.

Should Plaintiffs choose to forego class certification, Proposed Requests to Charge and Proposed Voir Dire shall be submitted to this Court within 60 (sixty) days of the date of this Order.  If Plaintiffs choose not to seek class certification, a Joint Pre-trial Statement, which shall conform to the Court's Individual Practices and Supplemental Trial Procedure Rules, also shall be submitted within 60 (sixty) days of the date of this Order.  Memoranda of Law addressing those issues raised by the Joint Pre-trial Statement shall be submitted

on the same day as the Joint Pre-Trial Statement, and responses
to such Memoranda, if any, shall be submitted within 15 (fifteen)
days thereafter.   There shall be no replies.


SO ORDERED.


Dated:     New York, New York
           August 9, 2007


                                      _Deborah A. Batts_
                                       Deborah A. Batts
                                  United States District Judge


47